hmg.2.17.26



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Northern Division*

Sean R. Delaney
Assistant United States Attorney
Sean.Delaney@usdoj.gov

*Mailing Address:*
36 S. Charles Street, 4th Floor
Baltimore, MD 21201

*Office Location:*
36 S. Charles Street, 4th Floor
Baltimore, MD 21201

*DIRECT: 410-209-4913*
*MAIN: 410-209-4800*

✓ FILED  ___ ENTERED
___ LOGGED  ___ RECEIVED

February 18, 2026

12:18 pm, Mar 05 2026
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ____R.C.____ Deputy

**VIA ELECTRONIC MAIL**
Tony Garcia, Esq.
Garcia Law
7 Saint Paul, Suite 1100
Baltimore, MD 21201
Tony@tngarcialaw.com

Re:   *United States v. James Carroll Erny*, Crim. No: RDB-25-162

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, James Carroll Erny (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by February 20, 2026, it will be deemed withdrawn. The terms of the Agreement are as follows:

<u>Offense of Conviction</u>

1.   The Defendant agrees to plead guilty to Count One of the Indictment, which charges the Defendant with Bribery Concerning Programs Receiving Federal Funds, in violation of 18 U.S.C. § 666(a)(2). The Defendant admits that the Defendant is, in fact, guilty of the offense and will so advise the Court.

<u>Elements of the Offense (Bribery Concerning Programs Receiving Federal Funds)</u>

2.   The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the dates alleged in the Indictment, in the District of Maryland,

a.   First, that co-conspirator Joseph Gillespie was an agent of Baltimore City, Maryland;

b.   Second, that in a one-year period, Baltimore City received federal benefits in excess of $10,000;

c.   Third, that the Defendant gave (or agreed to give or offered) something of value to Joseph Gillespie;

Rev. August 2018

d.     Fourth, that the Defendant acted corruptly with the intent to influence or reward Joseph Gillespie with respect to a transaction of Baltimore City; and

e.     Fifth, that the value of the transaction to which the payment related was at least $5,000.

Penalties

3.     The maximum penalties provided by statute for the offense to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 666(a)(2) | N/A | 10 years | 3 years | $250,000 or twice the gain or loss from the offense | $100 |

a.     Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b.     Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

c.     Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d.     Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

e.     Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f.     Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant

authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

Waiver of Rights

4.  The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

    a.  If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    b.  If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    c.  If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

    d.  The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

    e.  If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    f.  By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g.      If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

<u>Advisory Sentencing Guidelines Apply</u>

5.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

<u>Factual and Advisory Guidelines Stipulation</u>

6.      This Office and the Defendant stipulate and agree to the Stipulation of Facts set forth in Attachment A, which is incorporated by reference herein.

<u>Count One (Count of Conviction – Bribery Concerning Programs Receiving Federal Funds)</u>

a.      This Office and the Defendant agree that the base offense level for Count One, pursuant to U.S.S.G. § 2C1.1(a), is **12 (twelve)**.

b.      This Office and the Defendant further agree, pursuant to U.S.S.G. § 2C1.1(b)(1), that there is a **2 (two)** level increase because the offense involved more than one bribe (subtotal: **14**).

c.      This Office and the Defendant further agree, pursuant to U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1)(E), that there is an **8 (eight)** level increase because the loss amount for the offense was more than $95,000, but was less than $150,000 (subtotal: **22**).

### Relevant Conduct (Wire Fraud Offense)

  d. This Office and the Defendant further agree that the Stipulation of Facts specifically establishes the commission of a wire fraud offense ("wire fraud offense") pursuant to U.S.S.G. § 1B1.2(c).

  e. This Office and the Defendant further agree that the base offense level for the wire fraud offense is **7 (seven)**, pursuant to U.S.S.G. § 2B1.1(a)(1).

  f. This Office and the Defendant further agree that there is a **14 (fourteen)** level increase, pursuant to U.S.S.G. § 2B1.1(b)(1)(H), because the loss amount was more than $550,000 but less than $1,500,000 (subtotal: **21**).

  g. This Office and the Defendant further agree that there is **2 (two)** level increase, pursuant to U.S.S.G. § 2B1.1(b)(10)(C), because the offense otherwise involved sophisticated means and the Defendant intentionally engaged in or caused the conduct constituting sophisticated means (subtotal: **23**).

### Grouping And Combined Offense Level

  h. Pursuant to U.S.S.G. § 3D1.4, counting **1 (one)** unit for the Group for the offense of conviction and 1 **(one)** unit for the wire fraud offense results in an increase of 2 levels to the Group with the highest offense level (**23**)—or a total of **25**.

  i. This Office does not oppose a **2 (two)** level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **1 (one)** level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

  j. Thus, the final anticipated adjusted offense level is **22**.

  k. This Office will not oppose a two-level downward adjustment if the Court determines that the Defendant meets the criteria listed in U.S.S.G. § 4C1.1.

  7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a

part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8.  Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

### Obligations of the Parties

9.  At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, to include a sentence outside the advisory Guidelines range, a period of supervised release, and/or a fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

### Waiver of Appeal

10. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

   a.  The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

   b.  The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

   c.  The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Forfeiture

11. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

Rev. August 2018

12. Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in the following items that the Defendant agrees constitute money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities: a money judgment in the amount of at least $300,961.22.

13. If specific direct or substitute assets are forfeited and liquidated, any net proceeds of the asset shall be applied to the money judgment. The Defendant acknowledges that, due to his acts or omissions, the total proceeds he obtained as a result of the scheme to defraud are not available to the government for forfeiture, and the government is entitled to the forfeiture of substitute assets because at least one of the conditions in 21 U.S.C. § 853(p) has been met.

14. The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

15. The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

16. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

Collection of Financial Obligations

17. The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court. If restitution is not paid by the date of sentencing, in order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party. If restitution is not paid by the date of sentencing, the Defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form this Office prescribes and as it directs. The Defendant promises that any financial statement and disclosures the Defendant submits will be complete, accurate and truthful, and understands that any willful

falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C.§ 1001 by an additional five years' incarceration and fine.

### Defendant's Conduct Prior to Sentencing and Breach

18.  Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

19.  If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement.

### Restitution

20.  The Defendant agrees to the entry of a restitution order for the full amount of the victims' losses. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation, which the parties stipulate is at least **$448,445.51** (reflecting $300,961.22 to Cross River Bank and $147,484.29 to the City of Baltimore).

21.  The total amount of restitution shall be due immediately and shall be ordered to be paid forthwith. Any payment schedule imposed by the Court establishes only a minimum obligation. Defendant will make a good faith effort to pay any restitution. Regardless of Defendant's compliance, any payment schedule does not limit the United States' ability to collect additional amounts from Defendant through all available collection remedies at any time. The Defendant further agrees that the Defendant will fully disclose to this Office, the probation officer, and to the Court, subject to the penalty of perjury, all information (including but not limited to copies of all relevant bank and financial records) regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this Agreement, and this Office may seek to be relieved of its obligations under this Agreement.

### Court Not a Party

22. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

23. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Kelly O. Hayes
United States Attorney

_____
Digitally signed by SEAN DELANEY
Date: 2026.02.18 11:19:13 -05'00'

Sean R. Delaney
Assistant United States Attorney

[THIS SPACE INTENTIONALLY LEFT BLANK]

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

2/23/26
Date

James Carroll Erny
Defendant

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

2/23/26
Date

Tony Garcia, Esq.
Counsel to Defendant

## ATTACHMENT A

### STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

Defendant James Carroll Erny, age 53, is a resident of Glen Arm, Maryland. At all relevant times, Defendant owned least eight real estate properties in Baltimore City, Maryland, which owed various liabilities to Baltimore City, Maryland, including for property taxes and water service.

Co-conspirator Joseph Gillespie was a resident of Baltimore City and employed by the Department of Revenue Collection, Baltimore City and, in that role, acted as an agent of Baltimore City.

Co-conspirator Ahmed ("Adam") Sary was a resident of Baltimore City.

Beginning in December 2019 and continuing through in or about August 2023, Defendant engaged in a bribery scheme with Gillespie where, in exchange for bribes Defendant paid to Gillespie, Gillespie used his official position as an employee of Baltimore City to extinguish various financial obligations owed to the City by Defendant in connection with the properties he owned, including for unpaid water and tax bills.

Defendant paid Gillespie at least $25,000 in bribes in connection with the scheme and caused losses to the City of at least $147,484.29.

Moreover, beginning in March 2021 and continuing through September 2021, Defendant and Sary engaged in a separate scheme to defraud a financial institution, Cross River Bank, and the United States Small Business Administration ("SBA"), to obtain fraudulent loans for various purported businesses under the Paycheck Protection Program ("PPP"), which was part of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, and the Economic Injury Disaster Loan ("EIDL") program.

Ultimately, Defendant fraudulently obtained $996,240 in fraudulent PPP funds as part of the scheme, and he attempted to obtain more than a $100,000 worth of EIDL funds too. However, none of those EIDLs ultimately closed.

Defendant's criminal acts are described in further detail below.

### Bribery Scheme

At all relevant times, Gillespie was an employee within the Baltimore City Department of Finance, Revenue Collections Department, located within the Abel Wolman Municipal Building in downtown Baltimore City. Gillespie was hired by Baltimore City in or about June 2006 and served as an agent of Baltimore City—a City that in each calendar year from 2020 to 2023 received federal benefits in excess of $10,000.

Beginning in or about December 2019, at the latest, and continuing until August 2023, Defendant engaged in a bribery scheme with Gillespie in which Gillespie abused his position of trust as a public official for his own personal gain.

During this period, Defendant—who owned at least eight properties in Baltimore City— routinely paid bribes to Gillespie in exchange for Gillespie delaying, removing or extinguishing

financial obligations owed to the City, including for unpaid citations, tax obligations, and water obligations—thereby causing losses to the City.

Defendant primarily paid these bribes to Defendant by cash—providing Gillespie envelopes containing as much as $1,000 each while Gillespie was working at the Abel Wolman Municipal Building. At times, Defendant would provide Gillespie envelopes containing cash bribes in a men's bathroom at the building. Defendant also routinely provided Gillespie bribe payments via Cash App and Zelle—paying Gillespie least $9,253 for the time period of August 2021 to August 2023.

Defendant and Gillespie routinely communicated about the bribery scheme over Facetime and iMessage and using Signal, an encrypted messaging service.

For example, in September 2022, Defendant and Gillespie discussed over iMessage various properties owned by Defendant that each had outstanding financial obligations due to Baltimore City. In response to an inquiry from Defendant concerning three properties, Gillespie wrote the monies owed in connection with each property, "[Address 1] is $18,303.13[.] [Address 2]- $18,669.85[.] [Address 3]- $10,018.7." Defendant wrote, "Can u pay about half on these ? And i take care of the rest[.] We can do 1 a week for the next couple weeks."

Referring to the size of the bribe he would pay Gillespie to remove the financial obligation, Defendant responded, "20%?" or a bribe equaling 20% of the amount Defendant owed on the various properties. Thereafter, Defendant and Gillespie continued to negotiate about what portion of the monies owed to Baltimore City, if any, would be paid by Defendant, the size of the bribe Defendant would provide to Gillespie and, eventually, the timing of their meeting.

For example, Defendant and Gillespie had the following exchange on September 12, 2022 and September 13, 2022:

Defendant: What's the lowest possible?

Gillespie: 7 ?

Defendant: I thought I was hitting u w 25%

Gillespie: How much u got for it man lol

Defendant: As much for you and as little for them as possible?

Gillespie: 6k for city ? That's cool on 18 bro

Defendant: f the city. and YES! $6k even?

Gillespie: Bout 6500

. . . .

Defendant: Cash or cashiers check?

Gillespie: Cash

. . . .

Defendant: Me and u today I'm good if your good. Inside or outside?

Gillespie: Come get bill Go to mens room After paid Handshake hug done Lol[.]

On September 13, 2022, Defendant paid Gillespie a $2,500 bribe in exchange for Gillespie's removal of more than $11,659.80 in funds owed to the City.

Likewise, on February 2, 2023, Defendant once again offered Gillespie a bribe in exchange for removing financial obligations he owed Baltimore City in connection with multiple properties. Defendant had the following exchange with Gillespie:

Defendant: Will 20% get you motivated? [Address 1] ? Or [Address 2] / [Address 3] / [Address 4] [Address 5] / [Address 6] [Address 7]

Gillespie: Ok bro[.] Shit just slow[.] I ain't forget u[.]

Defendant: Hit them all if slow before this city gets its shit straight. PLEASE[.] Tax TOO?

Gillespie: Yessir

Defendant: [Address 1] was supposed to have been done and I paid you for it I thought. No worries though it's grown bigger and I'll still pay you full amount you request.

Gillespie: U ain't pay for me they one bro[.] That[.] It's going to get done[.]

Defendant: I don't care.

Gillespie: Lol

Defendant: Truly. I'm happy to pay u instead of corrupt politicians[.]

Likewise, on March 26, 2023, Defendant, using iMessage, sent Gillespie photographs of City of Baltimore water bills associated with four properties he owned—one property had an amount due of $30,652.22; one had an amount due of $7,721.43; one had an amount due of $5,049.87; and one had an amount due of $6,322.41. Defendant wrote, "5 K to make them all go away"—referring to the outstanding balance Defendant owed on each property.

Gillespie responded, "Working on them[.] Don't need 5 K bro[.] More like 2500-3000[.]" Defendant would go on to pay Gillespie a $2,500 bribe in exchange for removing the outstanding balance owed to Baltimore City on each property.

In total, Defendant paid Gillespie at least $25,000 in bribes in connection with the scheme and caused losses to Baltimore City of at least $147,484.29.

## CARES Act Fraud Scheme

### *PPP Loan ($996,240) – The Jackson Group*

On or about April 2, 2021, co-conspirator Ahmed Sary, with the assistance of Defendant, submitted a fraudulent PPP loan application to Cross River Bank to obtain a PPP loan for The Jackson Group—a real estate business owned by Defendant.

The PPP loan application contained multiple material misrepresentations, including that The Jackson Group in 2019 had 63 employees and an average monthly payroll of $398,496.38. In support of the loan application, a fabricated 2019 Internal Revenue Service (IRS) Form 940—Employer's Annual Federal Unemployment Tax Return—was submitted, which falsely indicated that the entity's "[t]otal payments to all employees" in 2019 was $4,781,956.78.

The IRS Form 940 was not legitimate, and the information within it was false. In fact, The Jackson Group had no employees and did not report paying any wages to or withholding federal income tax from any employees during the 2019 tax year—as confirmed by IRS records.

Additionally, Defendant provided Sary copies of various documents to be submitted in connection with the PPP loan application, including photographs of his driver's license.

Based on the false representations and fraudulent submissions made on behalf of Defendant as the owner of The Jackson Group on April 3, 2021, the PPP loan was funded, and approximately $996,240 was distributed by Cross River Bank to a BB&T bank account controlled by Defendant. The distribution of these funds caused the transmission of interstate wires to and from Maryland.

Defendant agreed to pay Sary a kickback payment for his work in submitting the false application and obtaining the fraudulent PPP loan. After the PPP loan funds were received by Defendant, Defendant provided Sary with seven checks, totaling $192,000 (approximately 20% of the PPP loan amount)—which were drawn on The Jackson Group's bank account controlled by Defendant. The payments were structured into seven checks to launder the funds and disguise the true nature of the payments. Also, several of the checks contained false information in the memo line, such as "marketing," "supply's," "uniforms," and "transport," which was meant to further obfuscate the true nature of the payments. On each of those checks, Defendant left the payee name blank. Thereafter, Sary—to launder the proceeds and attempt to conceal their nature and purpose—wrote a different payee name on each of those checks and deposited them in accounts he controlled.

Approximately one month after The Jackson Group PPP loan was funded, a portion of the Jackson Group Inc PPP loan was reversed out of the BB&T bank account ending in 54629 by Cross River Bank. A note in Cross River records on May 7, 2021, indicated that The Jackson Group PPP loan application was "Suspected of fraud" and the bank was "requesting recall of funds." On May 10, 2021, $695,278.78 were force debited from The Jackson Group's BB&T bank account ending in 54629.

Despite the suspicion of fraud, Defendant retained approximately $300,961.22 in PPP loan proceeds (as calculated by the initial loan disbursement of $996,240 minus the reversed amount of $695,278.78).

Shortly after the bank transaction reversal, Sary returned a portion of the kickback payments he had received from Defendant (approximately $79,689). The return of the kickback payments was patterned in a similar way as the initial kickback checks had been paid. There were multiple checks in differing amounts, the checks were drawn from two different bank accounts, and they were made out to different payees, but noted in their memo line that they were intended for Defendant: their memo lines noted "Acct of James Erny."

### *Establishment of Payroll for Purported Employees*

According to the parameters of the PPP, proceeds from a PPP loan were required to be used only for certain permissible business expenses, including payroll costs, mortgage interest, rent, and utilities. Defendant and Sary were aware that, under the applicable PPP rules, interest and principal on a legitimate PPP loan were eligible for forgiveness, if the business spent the loan proceeds on permissible items within a designated period of time and used a certain portion of the loan toward payroll expenses.

Accordingly, in an attempt to make it appear that the PPP loan funds were being used for legitimate purposes, in April 2021, Defendant, at the suggestion of Sary, signed an agreement with Heartland Payment Systems, Inc. ("Heartland") to provide payroll services to purported employees of The Jackson Group. Pursuant to the agreement, and at the direction of Defendant, Heartland withdrew funds from the BB&T account referenced above, and made payments using the PPP

funds to purported employees of the Jackson Group, including Defendant, his mother, aunt and various other friends and associates.

The purpose of establishing payroll services for The Jackson Group after receipt of the PPP loan was to facilitate the creation of documentation that could be used to substantiate a request for the PPP loan to be forgiven.

In total, $24,510.43 in sham payroll payments were made using funds traceable to the PPP loan obtained by Defendant and The Jackson Group. None of the purported employees were in fact legitimately employed by The Jackson Group during the time period after the PPP loan was received. Defendant ultimately did not make any payments to Cross River Bank in connection with the PPP loan obtained for The Jackson Group.

Records obtained from Apple, Inc. in response to a federal search warrant for Defendant's iCloud account revealed that Defendant made various notes about the scheme, including "What risk do my payees face? Mom? Do the SS#s have to be real? Will the Govt contact my payees." He also emailed Sary with questions about the payroll scheme and his purported employees, asking, among other things, "Same last name ok? . . . Do banks get a flag for a certain amount of cash and check withdrawal? Like 10K I've heard? Can you transfer money with in the same bank like checking to saving without drawing attention?"

### *EIDL Attempts – The J-Jackson Group & St. Paul Assisted Living*

In addition to the fraudulent PPP loan, Defendant with the assistance of Sary on September 12, 2021 also attempted to obtain a fraudulent EIDL for a purported business called The J-Jackson Group, Inc. in the amount of $138,000; however, this loan ultimately did not close. He also attempted to obtain two fraudulent EIDLs for a purported business called St. Paul Assisted Living on April 7, 2020 and September 2, 2021. These loans did not close either.

### *Spending of PPP Funds*

Defendant spent the fraudulently obtained loan proceeds in various ways that were impermissible under the PPP program, including by paying $192,000 in kickbacks to Sary, using the funds to make a $17,200 cash withdrawal for himself, paying off various personal debts, paying contractors for work on various properties he owned, and providing PPP funds to various family members (including his mother, uncle, and relatives of his wife).

SO STIPULATED:

Digitally signed by SEAN DELANEY
Date: 2026.02.18 11:19:39 -05'00'

Sean R. Delaney
Assistant United States Attorney

2/23/26
Date

James Erny
Defendant

2/23/26
Date

Tony Garcia, Esq.
Counsel to Defendant

Rev. August 2018

15